ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **VECTOR BUILDERS GROUP CORP.** <br> RECURRENTE(S) <br><br><br> V. <br><br><br> **DEPARTAMENTO DE RECURSOS NATURALES Y AMBIENTALES** <br> RECURRIDA(S) <br><br> **OFICINA DE GERENCIA DE PERMISOS** <br> AGENCIA RECURRIDA | **KLRA202300003** | ***REVISIÓN DE DECISIÓN ADMINISTRATIVA*** procedente de la Oficina de Gerencia de Permisos <br><br> Caso Núm. **2022-466126-PCT-010796** <br><br> Sobre: Mitigación de Emergencia |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Jueza Rivera Pérez.

*Barresi Ramos*, juez ponente.

# S E N T E N C I A

En San Juan, Puerto Rico, hoy día 4 de marzo de 2024.

Comparece ante este Tribunal de Apelaciones, **VECTOR BUILDERS GROUP CORP.** (**VECTOR BUILDERS**) mediante *Revisión Judicial* instada el 4 de enero de 2023. En su recurso, nos interpela para que revisemos la *Resolución de Denegatoria* dictada el 22 de noviembre de 2022 por la **OFICINA DE GERENCIA DE PERMISOS** (**OGPE**).[1] Mediante dicha *Resolución de Denegatoria* se declinó la *Solicitud de Permiso Formal para Extracción de Materiales de la Corteza Terrestre Número 2022-466126-PCT-010796* amparándose en la Regla 3.5.2 del *Reglamento Conjunto 2020*.[2]

---

[1] El aludido dictamen administrativo fue notificado el 22 de noviembre de 2022. Véase Apéndice de *Revisión Judicial,* págs. 49- 52.

[2] Cabe resaltar que nuestro Tribunal Supremo declaró nulo el Reglamento Conjunto 2019 y el Reglamento Conjunto 2020. Empero, determinó que tal determinación de nulidad tiene un efecto prospectivo. Es decir, la nulidad alcanzará solamente a los permisos que se otorguen después de ese proceder. De esa manera, todo permiso autorizado y expedido al amparo de los citados reglamentos, previo a la emisión de esa decisión, deberá aceptarse como valido por toda la ciudadanía y agencias concernientes. Véase *Martínez Fernández et al. v. OGP et al.*, 2023 TSPR 75, 212 DPR ___.

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

**– I –**

El 10 de noviembre de 2020, **VECTOR BUILDERS** adquirió un predio de terreno ubicado en el Barrio Sabana en el Municipio de Vega Alta, Puerto Rico. La descripción rústica del predio consiste en lindes por el Norte, Sur y Este con la finca principal de la cual se segrega perteneciente a la Autoridad de Tierras de Puerto Rico (ATP); y por el Oeste, con la carretera estatal número 690 y con un predio dedicado a uso público.[3] Dicho bien inmueble consta inscrito al folio 127 del tomo 23 de Vega Alta, finca 1042, Sección III del Registro de la Propiedad de Bayamón.[4]

Tiempo después, el 21 de septiembre de 2021, el señor Miguel A. Navas Flores, director de la Oficina Municipal para el Manejo de Emergencias del Municipio de Vega Alta, expidió una *Certificación* en la cual hizo constar que observó un derrumbe en la ladera del monte que colinda con el terreno.

En consecuencia, el 26 de noviembre de 2021, el señor José Laureano, Oficial III del Bosque Vega, emitió un *Informe del Oficial de Bosque* en el cual detalló la labor de estabilización de la montaña por el deslizamiento que existió en el referido terreno.[5] El 21 de diciembre de 2021, el ingeniero civil Iván D. Hernández González elaboró un *Reporte sobre Inspección de Estado de Taludes y Terreno* del bien inmueble.[6] En su *Reporte,* puntualizó que la montaña se encontraba fracturada en múltiples áreas lo que provoca múltiples deslizamientos de roca y material de manera constante en el lado sur del predio de terreno.

El 18 de mayo de 2022, el señor Carlos Martínez, consultor ambiental, formuló una *Certificación de Volumen de Material de*

---

[3] Véase Apéndice de *Revisión Judicial,* págs. 1- 15.
[4] *Íd.*.
[5] *Íd.*, pág. 17.
[6] *Íd.*, págs. 18- 22.

*Corteza Terrestre* en el cual aseveró que del mogote que ubica en el predio del terreno se habían desprendido unos 2,513 metros cuadrados de los cuales 392,028.00 metros cúbicos se encontraban inestables.[7] Además, recomendó procurar con carácter de urgencia la autorización para efectuar los cortes de terreno en aras de lograr estabilizar los taludes, los cuales representan una amenaza para la salud y la seguridad.[8]

Luego, el señor Carlos Martínez, consultor ambiental, redactó un *Memorial Explicativo Mitigación de Emergencia de una Parte de un Mogote Inestable por Paso del Huracán Fiona* mediante el cual aclaró que con el paso del temporal se agravó la situación peligrosa existente en el mogote inestable que ubica en el terreno.[9] El 18 de agosto de 2022, el señor Carlos Martínez, consultor ambiental, remitió un *Endoso de Emergencia para la Estabilización de una Parte del Mogote Inestable* al **Departamento de Recursos Naturales y Ambientales** (**DRNA**).[10]

El 19 de octubre de 2022, el señor Navas Flores, director de la Oficina Municipal para el Manejo de Emergencias del Municipio de Vega Alta, suscribió *Certificación* en la cual expresó que ante el paso del huracán Fiona en septiembre de 2022, el derrumbe se agravó incluso afectando las maquinarias allí guardadas.[11]

Más tarde, el 14 de noviembre de 2022, la **OGPe** tramitó una *Certificación de Cumplimiento Ambiental por Exclusión Categórica.*[12] Ese mismo día, el señor Rafael Mojica Pérez trascribió un *Plan de Restauración* cuya certificación expresó: "la actividad de mitigación de emergencia propuesta, no menoscaba la salud, la seguridad, el

---

[7] Véase Apéndice de *Revisión Judicial*, pág. 23.
[8] *Íd.*
[9] *Íd.*, págs. 24- 27. El 19 de octubre de 2022, el señor Miguel A. Navas Flores, director de la Oficina Municipal para el Manejo de Emergencias del Municipio de Vega Alta, redactó una *Certificación*. Véase Apéndice de la *Revisión Judicial*, pág. 39.
[10] *Íd.*, págs. 28- 37.
[11] *Íd.*, pág. 39.
[12] *Íd.*, págs. 41- 43.

orden o el interés público del sector.[13] Incluyó un *Plano de Mensura y Perfiles de Terreno*. El susodicho *Plan de Restauración* del proyecto desglosó: (1) realizar cortes en los taludes de la montaña de manera que se estabilicen y se minimicen los desprendimientos de terreno; (2) se requiere preparar y hacer cortes a los taludes reduciendo la inclinación y llevando la pendiente a un máximo de un 33% desde el pie de la montaña; y (3) hacer reparaciones creando terrazas donde sea posible a una altura de cada siete (7) metros. Las terrazas deberán tener una profundidad de no menos de 2 metros.[14]

El 16 de noviembre de 2022, **VECTOR BUILDERS** incoó la solicitud número 2022-466126-PCT-010796 para el *Tipo de Trámite de Permiso Formal de Extracción de los Materiales de la Corteza Terrestre* (para extraer unos 392.028 metros cúbicos diarios de roca caliza). El 22 de noviembre de 2022, la **OGPe** pronunció la *Resolución de Denegatoria* recurrida. En la aludida *Resolución de Denegatoria*, la **OGPe** realizó las siguientes determinaciones de hechos:

1. El 16 de noviembre de 2022, Vector Builders Group, Inc., (en adelante el Peticionario) radicó ante la Oficina de Gerencia de Permisos (OGPe) la Solicitud 2022–466126-PCT-010796 para el Tipo de Trámite de Permiso Formal de Extracción de los Materiales de la Corteza Terrestre para extraer 392,028 metros cúbicos diarios de Roca Caliza.

2. La acción propuesta en el permiso ubica en el Bo. Sabana, con acceso a través de la Carr. PR-690 del Municipio de Vega Baja. La clasificación del suelo es Conservación de Recursos (CR) y una clasificación de Suelo Rústico Especialmente protegido Agrícola (SREP–A) y Ecológico (SREP–E). Se identifica como un Área de Prioridad de Conservación y parte del área se encuentra dentro de la delimitación de la Reserva Natural Bosque Estatal de Vega.

3. La determinación de cumplimiento ambiental para la acción propuesta fue aprobada mediante el mecanismo de exclusión categórica a través del caso núm. (2022-466126–DEC–115472. Bajo dicho trámite se reclamó y se determinó como aplicable a la acción propuesta, la acción enlistada en el inciso el número 5: "Acciones remediativas dirigidas hacia la protección del ambiente, de conservación de recursos, planes de mitigación, limpiezas y

---

[13] Véase Apéndice de la *Revisión Judicial*, págs. 44- 46.
[14] *Íd.*, pág. 44.

disposición de materiales contaminantes, reparación de emergencias en infraestructuras existentes, entre otros" de la Orden Administrativa OA–2021–02 del DRNA.

4. En el expediente digital obra un memorial explicativo, evidencia de cumplimiento ambiental a través de la exclusión categórica 2022–466126–DEC –115472, fotos del predio, Reporte sobre Inspección de Estado de taludes y terreno realizado por el Ing. Iván Hernández, Lic. #14265, Certificación [de] la finca Municipal de Manejo de Emergencias de Vega Baja, carta explicativa emitida para el Departamento de Recursos Naturales y Ambientales (DRNA), Plan de Restauración, Certificación del porciento de área a perturbarse, carta del Oficial de Manejo del Bosque Vega (sin firmar), certificado de no deuda bajo las disposiciones de la Ley Núm. 132 de 25 de junio de 1968, según enmendada, Ley para Reglamentar la Extracción de Arena, Grava y Piedra, plano de mensura con perfiles del área propuesta preparado por el Ing. Rafal Mojica, Lic. #9808 y sus credenciales.

5. En el memorial explicativo presentado se indicó lo siguiente: "El pasado 14 de mayo de 2022 inspeccionamos y mensuramos el área inestable del mogote compuesto de roca cálcica y arcilla con unos taludes que varían desde 60 grados a 80 grados con respecto a la horizontal. Este se localiza en la PR–690 en el Bo. Sabana en Vega Alta. El mogote tiene un área de 1,119,222.465 metros cuadrados (Anejo 1) y el área del desprendimiento e inestable del mogote es de 2,513 metros cuadrados (Anejo 2) con una compactación de material de corteza de cuatro (4). Por ende, el volumen total de material de corteza terrestre inestable es de 392,028.00 metros cúbicos que es un 0.22% del mogote. Luego del paso del Huracán Fiona la situación en la parte del mogote inestable se agravó más. Se desprendieron más rocas de la cima del mogote y la tierra del mogote inestable se desprendió causando daño al equipo pesado que se encuentra en el lugar almacenado, cubriéndolo y enterrándolo en el predio. Por esta razón solicitamos un permiso formal para mitigar con carácter de emergencia a las agencias gubernamentales correspondientes la autorización para poder hacer los cortes del terreno para crear terrazas de 1:4 y estabilizar los taludes que son una amenaza a la salud y seguridad".

6. La Certificación del director de la Oficina Municipal Manejo de Emergencias, Miguel A. Navas Flores, fechada del 19 de octubre de 2022, establece que a consecuencia del paso del Huracán Fiona se ocasionó un derrumbe existente donde se agravó afectando maquinaria que había en el lugar. También indica que para evitar que el derrumbe continúe, recomienda se autorice un Permiso de Emergencia [o] los endosos pertinentes por parte [del] Departamento de Recursos Naturales y Ambientales (DRNA) y OGPe.

7. Como parte de las herramientas de trabajo utilizadas para la evaluación del caso, se utilizó el Sistema de Información Geográfica de la Junta de Planificación

(MIPR). El sistema cuenta con las capas de información donde se delimita el Área de Planificación Especial–Restringida del Carso (APE–RC), su Zona de Amortiguamiento y Área de Planificación Especial–Zona Cársica (APE–ZC).
8. De la información provista por el peticionario en relación con el área propuesta, con número de catastro 333-000–002–10; se determinó que la misma ubica dentro del Área de Planificación Especial–Restringida del Carso (APE–RC) y su Zona de Amortiguamiento.

En desacuerdo, el 5 de diciembre de 2022, **Vector Builders** presentó una *Moción de Reconsideración.*[15] Este petitorio no fue acogido por la **OGPe**.

Aún insatisfecho, el 4 de enero de 2023, **Vector Builders** acudió ante este Tribunal de Apelaciones mediante escrito intitulado *Revisión Judicial.* En la misma, señala el(los) siguiente(s) error(es):

> Erró la Oficina de Gerencia de Permisos (OGPe) al aplicar el Reglamento Conjunto 2020, Reglamento; el cual fue declarado nulo por el Tribunal por incumplir con la Ley de Procedimientos Administrativos Uniforme al momento de su aprobación.

> Erró la Oficina de Gerencia de Permisos (OGPe) al no utilizar el artículo 9 del Reglamento 6916 del 17 de diciembre de 2004, titulado Reglamento para Regir la Extracción, Excavación, Remoción y Dragado de los Componentes de la Corteza Terrestre según enmendado por el Reglamento Número 8191 del 4 de mayo de 2012.

El 17 de enero de 2023, dictaminamos *Resolución* en la cual, entre otras cosas, concedimos un plazo de treinta (30) días para presentar su(s) alegato(s) en oposición al recurso al **DRNA**. Consecuentemente, el 17 de febrero de 2023, **DRNA** presentó *Comparecencia Especial.*

El 7 de marzo de 2023, intimamos *Resolución* en la cual se concedió el plazo perentorio de treinta (30) días para presentar alegato(s) en oposición al recurso a la **OGPe**. Así, el 14 de marzo de

---

[15] Véase Apéndice de la *Revisión Judicial*, págs. 53- 64.

2023, la **OGPe** presentó su *Oposición a Recurso de Revisión.*

Evaluado concienzudamente el expediente del caso; y contando con el beneficio de la comparecencia de ambas partes; nos encontramos en posición de resolver. Puntualizamos las normas de derecho pertinentes a las (s) controversia(s) planteada(s).

**– II –**

**– A –**

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU) provee un cuerpo de reglas mínimas para gobernar los procesos de adjudicación y reglamentación en la administración pública.[16] Su sección 4.1 instituye la *revisión judicial* por este Tribunal de Apelaciones de las determinaciones finales de las agencias.[17]

La *revisión judicial* tiene como propósito limitar la discreción de las agencias y asegurarse de que estas desempeñen sus funciones conforme a la ley.[18] El criterio rector al momento de pasar juicio sobre una decisión de un foro administrativo es la razonabilidad de la actuación de la agencia.[19] Nuestra evaluación de la decisión de una agencia se circunscribe, entonces, a determinar si esta actuó de forma arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción.[20]

No obstante, las decisiones de los organismos administrativos especializados gozan de una presunción de legalidad y corrección, por lo que, sus conclusiones e interpretaciones merecen gran consideración y respeto.[21] Por ello, al ejecutar nuestra función revisora, este Tribunal está obligado a considerar la especialización y experiencia de la agencia, distinguiendo entre cuestiones de

---

[16] Conocida como la Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA § 9601-9713; *SLG Saldaña-Saldaña v. Junta,* 201 DPR 615, 621 (2018).
[17] 3 LPRA § 9671.
[18] *Torres v. Junta Ingenieros,* 161 DPR 696, 707 (2004).
[19] *Otero v. Toyota,* 163 DPR 716 (2005).
[20] *JP, Plaza Santa Isabel v. Cordero Badillo,* 177 DPR 177, 187 (2009).
[21] *García Reyes v. Cruz Auto Corp.,* 173 DPR 870, 891 (2008).

interpretación estatutaria —sobre las que los tribunales son especialistas— y cuestiones propias de la discreción o pericia administrativa.[22]

Ahora bien, tal norma no es absoluta. Nuestro más alto foro ha instaurado que no podemos dar deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.[23] Particularmente, concretó las normas básicas sobre el alcance de la revisión judicial al expresar:

> [L]os tribunales deben dar deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que, si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.

El alcance de la revisión de las determinaciones administrativas se ciñe a determinar lo siguiente: (1) si el remedio concedido por la agencia fue el apropiado; (2) si las determinaciones de hecho de la agencia están basadas en *evidencia sustancial* que obra en el expediente administrativo, y (3) si las conclusiones de derecho fueron las correctas.[24]

En cuanto a las determinaciones de hechos, estas serán sostenidas por los tribunales si están respaldadas por *evidencia sustancial* que surja del expediente administrativo considerado en su totalidad.[25] *Evidencia sustancial* es aquella relevante que una mente razonable puede aceptar como adecuada para sostener una conclusión.[26] Debido a la presunción de regularidad y corrección

---

[22] *OCS v. Point Guard Ins.,* 205 DPR 1005, 1028 (2020).
[23] *Torres Rivera v. Policía de PR,* 196 DPR 606, 625- 626 (2016).
[24] Sección 4.5 de la LPAU, 3 LPRA § 9675; *OEG v. Martínez Giraud,* 210 DPR 79 (2022).
[25] *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36 (2018).
[26] *Otero v. Toyota, supra,* pág. 728.

que cobija a las decisiones de las agencias administrativas, quien alegue ausencia de *evidencia sustancial* debe presentar prueba suficiente para derrotar dicha presunción.[27] Para ello "tiene que demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración".[28] A esto se le conoce como la norma de la *evidencia sustancial,* con la cual se persigue evitar sustituir el criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[29] Por lo tanto, aun cuando exista más de una interpretación razonable de los hechos, el tribunal debe dar deferencia a la agencia, y no sustituir su criterio por el de esta.[30]

Por otro lado, las conclusiones de derecho de la agencia son revisables en todos sus aspectos, sin sujeción a norma o criterio alguno.[31] Aun así, debemos dar deferencia a las interpretaciones que los organismos administrativos hacen de las leyes y reglamentos que administran. Es por ello que, ante casos dudosos, donde pueda concebirse una interpretación distinta de estas leyes y reglamentos, la determinación de la agencia merece deferencia sustancial.[32]

En suma, si la decisión recurrida es razonable y se sostiene en la *evidencia sustancial* que obra en el expediente administrativo, procede su confirmación.[33] Por el contrario, los tribunales revisores podemos intervenir con la decisión recurrida cuando no está basada en *evidencia sustancial,* o cuando la actuación es arbitraria, irrazonable o ilegal, o cuando afecta derechos fundamentales.[34]

---

[27] *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 128 (2019).
[28] *Gutiérrez Vázquez v. Hernández y otros,* 172 DPR 232, 244 (2007).
[29] *Pacheco v. Estancias,* 160 DPR 409, 432 (2003).
[30] *Íd.*
[31] *Rebollo v. Yiyi Motos,* 161 DPR 69, 77 (2004).
[32] *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 1002 (2011).
[33] *García Reyes v. Cruz Auto Corp.*, *supra*, pág. 893.
[34] *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581 (2020); *JP, Plaza Santa Isabel v. Cordero Badillo, supra.*

**– B –**

Con la aprobación de la *Ley Para la Reforma del Proceso de Permisos de Puerto Rico* se precisó en nuestro ordenamiento legal y administrativo los criterios que rigen el proceso de solicitud, evaluación, concesión y denegación de permisos por el Gobierno de Puerto Rico.[35] La precitada disposición tiene como objetivo la transformación del sistema de permisos en nuestra jurisdicción, de modo que, resulte en uno más transparente, ágil, confiable y eficiente.[36]

De ordinario, incorpora una estructura para la evaluación y otorgamiento de permisos conforme a las leyes y reglamentos aplicables, cuyo objetivo es alcanzar un balance entre el desarrollo económico, la protección de los recursos naturales y la protección del derecho al disfrute de la propiedad.[37] Igualmente, el mencionado estatuto creó la **Oficina de Gerencia de Permisos** (**OGPe**), organismo gubernamental adscrito a la Junta de Planificación, entidad a la cual se le confirió jurisdicción para evaluar, conceder y/o denegar determinaciones finales y permisos relacionados al desarrollo y uso de terrenos en Puerto Rico.[38]

**– C –**

En este caso, al momento de la evaluación de la consulta de ubicación para la segregación ante **OGPe**, se encontraba vigente el *Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios* (*Reglamento Conjunto 2020*).[39]

La Regla 3.5.2. del *Reglamento Conjunto 2020* contiene los criterios o factores que se podrán considerar al evaluar una solicitud

---

[35] Ley Núm. 161-2009, 23 LPRA § 9011. *Román Ortiz v. OGPe*, 203 DPR 947, 957 (2020); *Laureano v. Mun. de Bayamón*, 197 DPR 420, 433 (2017); *Horizon v. Jta. Revisora, RA Holdings*, 191 DPR 228, 236 (2014).
[36] *Exposición de Motivos*, Ley Núm. 161-2009, *supra.*
[37] *Id.*
[38] 23 LPRA § 9018. Véase, además *Miranda Correa v. DDEC et al.*, 2023 TSPR 40; 211 DPR ___.
[39] Reglamento Núm. 9233 de 2 de diciembre de 2020 (Reglamento Conjunto de 2020).

de permiso para extracción, excavación, remoción y dragado de los componentes de la corteza terrestre. Específicamente, su inciso k expresa: La actividad propuesta sea una extracción, excavación o remoción de roca caliza con propósitos comerciales o de nivelación de terrenos en una zona cárstica, según dispuesto en la Ley 292-1999, conocida como la *Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico* (Ley 292-1999).

Asimismo, la Regla 3.5.9 del *Reglamento Conjunto 2020* instituye los criterios de aplicabilidad para obtener un permiso formal para la extracción, excavación, remoción y dragado en caso de que no cualifique para una exención, a saber:

> a. La actividad propuesta se realice en una finca privada o en cauces de cuerpos de agua sitos en terrenos privados o públicos;
> b. La actividad esté asociada a un aprovechamiento de los bienes de dominio público marítimo terrestre mediante una concesión;
> c. **La actividad propuesta conlleve el movimiento de más de mil (1,000) metros cúbicos de arena o grava o más de cinco mil (5,000) metros cúbicos de cualquier otro material de la corteza terrestre**;
> d. La actividad propuesta sea con fines comerciales o de lucro;
> e. La actividad propuesta conlleve la operación de una cantera;
> f. La actividad propuesta se lleve a cabo bajo el nivel freático en terrenos privados y que no sea incidental a una obra autorizada por la OGPe; y
> g. El material excedente generado por la actividad, cualquiera que sea su naturaleza, se destine para fines comerciales, excepto que sea tramitado bajo un Permiso Único Incidental Operacional. (énfasis nuestro).

## – III –

**VECTOR BUILDERS** punteó en su *Revisión Judicial* dos (2) señalamientos de error. En primer lugar, cuestionó que **OGPe** se equivocó al aplicar el *Reglamento Conjunto 2020*, por este haber sido declarado nulo por un panel hermano de este Tribunal de Apelaciones.

Lo cierto es, que nuestro Tribunal Supremo resolvió que todo permiso autorizado y expedido **antes de 16 de junio de 2023** (fecha en que finalmente se dilucidó la controversia sobre la nulidad de los

Reglamentos Conjuntos 2019 y 2020), es válido y no le alcanzará la nulidad de los reglamentos. La nulidad en los permisos expedidos tendrá un efecto prospectivo, por ende, incluirá a los permisos otorgados después del referido dictamen.[40]

Conforme al expediente, el 16 de noviembre de 2022, **VECTOR BUILDERS** presentó ante la **OGPe** su *Solicitud de Permiso Formal para Extracción de Materiales de la Corteza Terrestre Número 2022-466126-PCT-010796*. Ello para la extracción de los materiales de la corteza terrestre de alrededor de 392,028 metros cúbicos. La **OGPe** determinó denegar el permiso de excavación. Esencialmente, fundamentó su proceder al amparo del *Reglamento Conjunto 2020* y concluyó que la propiedad está ubicada dentro del área de planificación especial–restringida del carso y es zona de amortiguamiento. Para esa fecha, las determinaciones de hechos y las conclusiones de derecho formuladas por la **OGPe** podían ser evaluadas a la luz del *Reglamento Conjunto 2020*. Por consiguiente, no erró la agencia al aplicar las disposiciones aplicables del citado *Reglamento*.

En segundo lugar, **VECTOR BUILDINGS** aludió que erró la **OGPe** al no aplicar las disposiciones del Artículo 9 del *Reglamento Núm. 6916* de 17 de diciembre de 2004, titulado *Reglamento para Regir la Extracción, Excavación, Remoción y Dragado de los Componentes de la Corteza Terrestre*, según enmendado por el *Reglamento Núm. 8191* de 4 de mayo de 2012. Este Reglamento tuvo el propósito de enmendar el *Reglamento Núm. 6916* para atemperarlo al *Reglamento Conjunto* vigente. Las enmiendas delimitaron las solicitudes que debían ser atendidas con carácter jurisdiccional por OGPe y las que serían evaluadas y procesadas por el Departamento de Recursos Naturales y Ambientales (DRNA).

---

[40] Véase *Martínez Fernández et al. v. OGP et al.*, 2023 TSPR 75, 212 DPR ___.

En específico el Artículo 9 del *Reglamento Núm. 8191* instituyó que los Permisos de Emergencias sobre movimiento de materiales de la corteza terrestre requeridos para resolver una situación de emergencia deberá solicitarse ante el DRNA.[41] Por tanto, es al amparo de este procedimiento especial del *Reglamento Núm. 6919*

---

[41] Las Secciones 9.1, 9.2 y 9.3 del *Reglamento Núm. 8191* disponen lo siguiente:

**Sección 9.1 – Aplicabilidad**
Toda actividad de movimiento de materiales de la corteza terrestre necesaria para atender y resolver una situaci6n de emergencia, urgencia o de interés público, que conlleve una coordinación interagencial y:
1. Que la actividad propuesta se lleve a cabo para resolver una situaci6n no previsible causada por desastres naturales, por fuerza mayor o por culpa o negligencia humana; y
2. Que la raz6n principal de la actividad no sea para fines comerciales. El material podrá venderse únicamente para sufragar los costos de la remediación. [...]

**Sección 9.2 – Procedimiento**
Todo movimiento de la corteza terrestre requerido para resolver una situación de la naturaleza descrita deberá canalizarse a través de la **Oficina de Manejo de Emergencias de este Departamento** o por medio de los Coordinadores Regionales de dicha oficina, por constituir una situaci6n de riesgo o amenaza a la vida, a la propiedad o al ambiente, que requiere de una acci6n diligente e inmediata.
El Secretario o su representante autorizado, deberá ser notificado a la mayor brevedad por el Director de la Oficina de Manejo de Emergencias del Departamento, quien le informará sobre la situación y los detalles de la misma. Evaluada la situación, el Secretario, o su representante autorizado, en coordinación con otros jefes de agenda o entidad pública, tomaran las medidas necesarias para atender la misma.
Todo movimiento de materiales de la corteza terrestre debe ser el estrictamente necesario y conveniente efectuar en consideración a la salud, a la·seguridad, al orden o al interés público o para el manejo y protección de algún recurso natural. Toda actividad remediativa deberá estar estrictamente supervisada por la entidad con responsabilidad primaria, estando presente en el área de los hechos el funcionario enlace del Departamento designado para atender la situaci6n, quien supervisará el personal del Departamento que este laborando en el lugar.

**Sección 9.3 - Requisitos de Presentación**
**Toda solicitud de Permiso de Emergencia, con la cantidad de copias requeridas, será presentada en la Oficina de Secretaria o en la Oficina Regional correspondiente** deberá cumplir con lo siguiente:
1. Llenar en todas sus partes el formulario de solicitud para Permiso de Emergencia, debidamente firmado por el peticionario. Deberá acompañarse con un expediente que contenga los documentos presentados, debidamente identificados y con un índice de referencia.
2. Memorial explicativo donde se describa detalladamente la emergencia:
[...]

enmendado que debió tramitarse la solicitud de emergencia y no mediante una solicitud de permiso formal ante la OGPe.

Tras un concienzudo análisis de la totalidad del expediente, no hallamos indicador alguno que vislumbre que la **OGPe** hubiese actuado de manera arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción. Contrario a ello, notamos que del expediente apelativo emana la existencia de suficientes elementos que nos llevan a concluir que la decisión administrativa está sustentada y/o avalada por *evidencia sustancial.*

No subsiste razón alguna, de hecho, o de derecho, que nos persuada a intervenir y variar la determinación recurrida. Además, de la *Revisión Judicial* entablada tampoco se desprende alguna otra prueba para rebatir la presunción de corrección que cobija el dictamen administrativo. Cónsono con lo anterior, somos del criterio de que la *Resolución de Denegatoria* decretada por la **OGPe** fue una apropiada. Así pues, brindamos la deferencia al organismo administrativo por su expertise; y nos abstenemos de intervenir dado que su decisión es una racional

**– IV –**

Por los fundamentos antes expuestos, ***confirmamos*** la *Resolución de Denegatoria* dictaminada el 22 de noviembre de 2022 por la **Oficina de Gerencia de Permisos** (**OGPe**).

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones